**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NORTH DAKOTA**
**NORTHWESTERN DIVISION**

| | | |
|---|---|---|
| Robyn G. Cook, | ) | |
| | ) | |
| Plaintiff, | ) | **ORDER GRANTING PLAINTIFF'S** |
| | ) | **MOTION FOR SUMMARY JUDGMENT** |
| vs. | ) | **IN PART AND DENYING** |
| | ) | **DEFENDANT'S MOTION** |
| Michael J. Astrue, | ) | |
| Commissioner of Social Security | ) | |
| Administration, | ) | Case No. 4:11-cv-043 |
| | ) | |
| Defendant. | ) | |

The plaintiff, Robyn G. Cook ("Cook"), seeks judicial review of the Social Security

Commissioner's denial of her applications for Disability Insurance Benefits ("DIB") under Title II

of the Social Security Act, 42 U.S.C. § 401-433, and Supplemental Security Income ("SSI") under

Title XVI of the Social Security Act, 42 U.S.C. § 1381, *et. seq*.

I.      **BACKGROUND**

        A.      **Procedural history**

        Cook filed applications for DIB and SSI on June 25, 2007, alleging that she has been

disabled and unable to work since January 15, 2005. (Tr. 161-71). Her applications were denied

initially and upon reconsideration. (Tr. 100-07). At her request, an administrative law judge

("ALJ") convened a review hearing on August 26, 2009. (Tr. 33-95, 119-31).

        The ALJ issued his written opinion on September 30, 2009. (Tr. 9-22). He concluded that

Cook was not disabled as defined by the applicable regulations and therefore entitled to neither DIB

nor SSI benefits. (Id.). Dissatisfied, Cook requested a review of the ALJ's decision with the

Appeals Council. (Tr. 27). Upon completion of its review, the Appeals Council adopted the ALJ's decision as the Commissioner's final decision. (Tr. 1-6).

Cook initiated the above-captioned action, seeking judicial review of the Commissioner's decision pursuant to 42 U.S.C. § 405(g). (Doc. No. 1). She filed a Motion for Summary Judgment and the Commissioner subsequently filed his own motion. (Doc. Nos. 10 & 16). Both motions have now been fully briefed and are ripe for the court's consideration.

### B.      General background

Cook stands five feet, three inches tall. At the time of her administrative hearing she was 53 years old and weighed 275 pounds. (Tr. 39-41). She is a high school graduate. (Id.). She has taken accounting courses at a community college but holds no advanced degrees. (Tr. 39-40). In the 15 years preceding the alleged onset of her disability, she worked as a "house mom" in a Las Vegas night club, a dispatcher for a trucking company she co-owned with her ex-husband, and an office manager assistant for an automotive plating and services company. (Tr. 43-46, 192, 227).

In 2007, Cook moved from Las Vegas to Minot, North Dakota. Although she has worked sporadically (and no more than parttime) at Bernina Plus, a sewing/fabric store in Minot, since the alleged onset date, she has not engaged in anything that qualifies as substantial gainful activity. (Tr. 228).

Cook has been diagnosed with degenerative disc disease, chronic pain, urinary urge incontinence, and depression. (Tr. 42). As of the date of the ALJ hearing, she was also extremely obese. She rates her daily pain as a six on a scale of one-to-ten. (Id.).

### C.    Medical and other records

Cook presented to Southwest Medical Associates, Inc. ("SMA"), in Las Vegas, Nevada, on January 18, 2004. (Tr. 238). According to the care note, she had a week long history of dysuria and increased frequency but was otherwise in good health. (Id.). She was diagnosed with a urinary tract infection, for which she was prescribed Tequin. (Id.).

Cook presented to the University Medical Center's ("UMC") emergency room twice in early 2005 with complaints of urinary difficulties and epigastric pain. (Tr. 265-72). In each instance she was discharged with instructions to take her prescribed medications as directed. (Id.).

Cook returned to UMC's emergency room on April 20, 2005, complaining of discomfort when urinating. (Tr. 265). Lab work ordered by the attending physician revealed little. (Tr. 268). She was again discharged with instructions to take her prescribed medication as directed. (Tr. 265).

On August 22, 2005, Cook presented to Sunrise Hospital and Medical Center in Las Vegas, Nevada, with complaints of intermittent back and leg pain. (Tr. 240). She was examined by Dr. Gary Goldberg, who reported that she exhibited no gross sensory deficits, had normal reflexes in her lower extremities, and was able to ambulate, albeit slowly on account of her pain. (Id.). X-rays revealed degenerative changes to her lumbosacral spine. (Tr. 243). She was given analgesics, a dose of steroids, and prescriptions for Soma and Lortab. (Tr. 240). She was further advised to rest and follow up with a specialist if her pains persisted. (Id.).

Cook returned to SMA on October 26, 2005, with complaints of lower back pain that radiated down her legs and into her toes. (Tr. 260). She requested pain medication and a refill of her Paxil prescription. (Id.). She was given Paroxetine, hydrocodone, and Cyclobenzaprine. (Id.)

Cook presented to Sahara Health Care for a chiropractic treatment in January 11, 2006. (Tr. 246-51, 253-55). She returned for additional treatment on January 18, January 25, and February 1, 2006. (Tr. 245).

Cook returned to SMA on May 30, 2006, with complaints of sciatica and stiffness in her upper back. (Tr. 258-59). She advised her treating physician, Dr. Nancy Lao, that she had taken neither over-the-counter nor prescription pain medication in the preceding month. (Id.). She denied having any bowel or bladder incontinence. (Id.).

Dr. Lao observed in her treatment notes that Cook was able to ambulate with the help of a walker. (Tr. 258). She hypothesized that Cook was suffering from lumbago and sciatica. (Tr. 259). However, she was reluctant to order any additional tests on account of the fact that Cook did not have health insurance. (Tr. 259). She instead advised Cook to take ibuprofen and use hydrocodone sparingly as a backup. (Id.). She further suggested that Cook that she seek assistance from UMC. (Id.).

Cook reported to UMC on January 14, 2007, with back pain ranging between seven and nine on a scale of one-to-ten. (Tr. 262). According to the screening/order/discharge form and accompanying examination notes, her chief complaints were back, arm, and leg pain. (Tr. 262-64). She was otherwise alert and did not appear to be in any acute distress. (Id.). She was discharged with medication. (Id.).

Cook returned to UMC on January 23, 2007. (Tr. 276-84). She was examined by Dr. Miguel Sepulveda. (Tr. 276-84). According to the "physician record," she voiced complaints of moderate back pain that was exacerbated by movement. (Tr. 276). Although she exhibited veterbral tenderness and decreased range of motion, her reflexes were normal. (Tr. 277). X-rays of her back

indicated that she was suffering from spondylolysis. (Tr. 277, 284). However, the radiologist was careful to note in his report that there were no definite acute findings. (Tr. 284). She was discharged with medication (Ultram and Pepcid) and instructed to return for followup exam in two weeks. (Tr. 277).

Cook presented to Trinity Hospital in Minot, North Dakota, on August 7, 2007, with complaints of abdominal pain. (Tr. 306). An ultrasound ordered by her attending physician, Dr. Ricardo Machado, indicated that she was suffering from gallstones. (Tr. 306).

On August 15, 2007, Cook was examined by Dr. Frank Shipley, who confirmed that Cook was likely suffering from gallstones. (Tr. 330). Noting Cook's limited resources, Dr. Shipley suggested that she contact Ward County Social Services for assistance. (Id.). In the interim, he wrote her a prescription for painkillers. (Id.).

The medical records indicate that a surgeon removed Cook's gallbladder laparoscopically in late August 2007. (Tr. 328-29). According to clinical notes signed by Dr. Shipley on August 22, 2007, the surgery was successful and Cook was doing well. (Tr. 328).

Cook was examined by Dr. Rajnikant Mehta at the SSA's behest on October 16, 2007. (Tr. 287-89). According to Dr. Mehta's notes, Cook walked with a slight limp, was unable to walk on her toes or heels for one or two steps, could not squat, and had limited range of motion in her back and neck. (Tr. 288). She retained normal range of motion in her upper extremities. (Id.) She had some limits on the range of motion in her lower extremities, however. (Id.) She could walk without assistance or supportive devices. (Tr. 288-89).

Dr. Mehta ordered x-rays of Cook's back, which revealed: (1) the presence of a minor anterior wedged compression involving the T12 vertebra; (2) mild multifocal degenerative changes

involving the thoracolumbar spine; and (3) the presence of multilevel degenerative disc disease involving the lumbrosacral spine. (Tr. 290, 304, 325).

On October 23, 2007, Dr. Thomas Christianson assessed Cook's residual functional capacity ("RFC"), presumably at the SSA's request. (Tr. 291-98). Based upon his review of Cook's medical records, Dr. Christianson determined that Cook remained capable of: (1) lifting and carrying ten pounds frequently and twenty pounds occasionally; (2) standing and/or walking for a total of about six hours in an eight-hour work day; (3) sitting for a total of about six hours in an eight-hour work day; (4) pushing and/or pulling without limitations; and (5) occasionally climbing, kneeling, stooping, and crawling. (Tr. 292-93). He further opined that Cook suffered from no demonstrable manipulative, visual, communicative, or environmental limitations. (Tr. 294-95). As discussed later, there is a substantial amount of record evidence that postdates Dr. Christianson's assessment, which he was not able to take into account.

Cook was examined by Dr. Manual Colon at Trinity Hospital's Pain Center on October 25, 2007. (Tr. 322). According to Dr. Colon's notes, Cook appeared to be under a significant amount of distress with any and every maneuver of her neck and lower back. (Tr. 323). She also had a significant amount of myofascial tenderness in her neck and upper back. (Id.) Dr. Colon's initial impression was possible radiculitis and possible fibromyalgia. (Id.).

MRIs of Cook's cervical and lumbar spine were performed on October 30, 2007. (Tr. 301-03). According to the radiologist's report, Cook's disk at L5-S1 was mildly flattened and moderately desicatted and there was a mild broad-based disk bulge that did not appear to have any mass effect on the adjacent nerve. There was slight narrowing of her left neural foramen at L3-4,

and she had disk-osteophyte complexes at C3-4 and C5-6, with the later possibly impressing on an existing nerve root. (Tr. 301-02, 318-19).

Cook received a cervical epidural steroid injection from Dr. Manual Colon on November 27, 2007. (Tr. 315-17). The injection only briefly alleviated her pain. (Tr. 313, 315-17).

Cook reported to Dr. Todd Fife on December 3, 2007, to establish care. (Tr. 313-14). She complained of back pain, bilateral knee pain, and leg cramps that interfered with her sleep. (Id.). She further reported that she had been taking oxybutin for her incontinence and, although it had helped, it did leave her mouth feeling dry. (Id.). X-rays ordered by Dr. Fife revealed that there were very early changes in her left knee. (Tr. 300, 312-14). Dr. Fife started her on Cymbalta, Ultram ER, and Detrol. (Tr. 313-14).

Cook followed up with Dr. Colon on December 12, 2007. (Tr. 311). According to Dr. Colon's notes, Cook was generally pleased with the results of her medications and was in no distress. (Id.).

Cook followed up with Dr. Fife on December 14, 2007. (Tr. 310). Dr. Fife found her to be pleasant and in no distress. (Id.). He further noted that Cook was doing well in terms of pain control when taking her medication and did not complain of headaches, fatigue, muskoskeletal issues, or skin concerns. (Id.). He planned to continue Cook on Cymbalta and Ultram ER. (Id.).

Cook returned to Dr. Fife on January 9, 2008, complaining that she was struggling to keep her thoughts and emotions intact. (Tr. 308). She further reported that she began having suicidal thoughts when taking Cymbalta. (Id.). Dr. Fife took Cook off Cymbalta, with the intent of starting her on Paxil. (Id) He further recommended that she seek therapy. (Id.)

Cook followed up with Dr. Fife on January 21, 2008. (Tr. 357). According to the treatment notes, she was having quite a bit of pain in her lower back and was unable to tolerate either Cymbalta or Lexapro. (Id.). Dr. Fife referred her to Dr. Colon. (Id.).

In February 2008, Cook was evaluated by the North Dakota Department of Human Services ("NDDHS") in connection with a request for vocational services. The NDDHS determined she was severely disabled, in a great deal of pain, and would only be able to work a very limited number of hours. (Tr. 230-235). Cook was assigned a vocational counselor. After she obtained parttime employment at Bernia Plus doing bookkeeping, the NDDHS purchased a chair with arm rests and adjustable lumbar support to assist with her employment. She was followed by the NDDHS for a number of months thereafter, and the NDDHS did not close its case file until November 2008, after Cook and her counselor were satisfied with her parttime employment. (Tr. 236).

Cook returned to Dr. Fife on March 20, 2008, with a cough, congestion, and shortness of breath. (Tr. 356). Dr. Fife concluded that she was suffering from acute bronchitis, for which he prescribed her doxycycline. (Id.).

Cook presented to Dr. Fife on April 14, 2008, "with ear pain, clicking and popping, as well as chronic pain and weight management." (Tr. 354). Dr. Fife started her on a multivitamin and Nasonex. (Id.). He also referred her to a nutritionist. (Id.).

Cook followed up with Dr. Colon on April 25, 2008. (Tr. 340). According to Dr. Colon's notes, he had planned to administer a second cervical epidural steroid injection to Cook. (Id.). However, he decided to postpone the procedure because she was recuperating from a recent bout of bronchitis and appeared to be short of breath. (Id.)

Cook reported to Dr. Fife on May 8, 2008, complaining of stuffiness in her eyes, itchiness, and continued wheezing. (Tr. 353). Determining that she was suffering from allergic rhinoconjuctivitis and reactive airways, Dr. Fife started her on Advair, Claritin, and Nasonex. (Id).

Cook was reevaluated by Dr. Fife on May 15, 2008. (Tr. 352). She reported that her respiratory difficulties had waned since taking Advair and Claritin. (Id.). Dr. Fife instructed her to continue taking Claritin, but cut back on the Advair. (Id.).

Cook reported to Trinity Hospital Pain Center on May 21, 2008. (Tr. 338-39). There she received a caudal epidural steroid injection from Dr. Colon. (Id.).

Cook presented to Dr. Fife on July 3, 2008, with bronchitis and trouble breathing. (Tr. 350). Dr. Fife gave her Lidoderm patches, along with a small supply of Vicodin for use on a temporary basis. (Id.).

Cook contacted Dr. Fife on August 25, 2008, seeking, inter alia, a referral to the pain clinic. (Tr. 348). Dr. Fife prescribed her Flexeril and referred her back to the pain clinic as needed. (Id.).

Cook presented to Dr. Fife on September 10, 2008, complaining of back pain and numbness in her legs. (Tr. 346). Dr. Fife noted that she had exhibited some paraspinal muscle tenderness, but otherwise had good reflexes and no sensory deficits. (Id.). His plan was for a short course of prednisone. (Id.).

Cook returned to Dr. Fife on October 6, 2008, with complaints of back pain. (Tr. 345). She was advised to continue taking her meds and to follow up with the pain clinic. (Id.).

Cook presented to Trinity Hospital Pain Center on October 14, 2008. (Tr. 336). There, she received a cervical interlaminar epidural steroid injection at C7-T1 from Dr. Colon. (Tr. 336-37).

Cook returned to Dr. Fife on November 10, 2008, to get her pain medication refilled. (Tr. 344). According to Dr. Fife's examination notes, Cook reported that her pain was controlled and that she was doing well. (Id.).

Cook presented to Dr. Fife on December 22, 2008, for a "recheck." (Tr. 342). She reported that she had some numbness and tingling in her hands, as well as occasional weakness in legs and hands. (Id.). However, she added that she was doing well overall and that her urge incontinence had shown significant improvement since she began taking Detrol. (Id.).

On January 8, 2009, Cook followed up with Dr. Fife. (Tr. 341). He reported that Cook was doing well overall. (Id.).

Cook next returned to Dr. Fife on June 17, 2009. (Tr. 361). According to Dr. Fife's notes, she had a lot of "breakthrough troubles" but was continuing to take her meds and was on a pain management program. (Id.).

Cook was next seen by Dr. Fife on April 2, 2009, complaining that she was finding it difficult to move around because of the pain. (Tr. 365). Dr. Fife directed her to take Vicodin three times per day and to continue taking Ultram ER. (Id.).

On May 1, 2009, Cook's parttime employer, Julie Rostad, provided an affidavit in support of Cook's claim for disability. Rostad stated that she was the owner of Bernina Plus and Cook's supervisor. She stated she employed Cook parttime to do bookkeeping. She stated that Cook has a difficult time performing her tasks, is unable to work at a competitive pace, and is unable to work a regular schedule. She stated that Cook works when she feels up to it and needs to work at a slower pace and take frequent breaks as needed, and that she allows Cook these special accommodations. (Tr. 228).

Cook returned to Dr. Fife on May 21, 2009, with complaints of severe pain and numbness in her fingers, wrists, and legs, lumbar pain, bilateral knee pain, difficulties sleeping because of the pain in her feet, and depression. (Tr. 363). Notably, she did not report any weakness or bowel or bladder dysfunction. (Id.). Dr. Fife responded by increasing her daily dosage of Lyrica, taking her off of Vicodin, and starting her on Oxycontin. (Id.).

Cook next saw Dr. Fife on June 15, 2009. (Tr. 361). According to the treatment notes, she found the Oxycontin both intolerable and too expensive. (Id.).

At some point Dr. Fife completed a Physical Capacities Evaluation of Cook. (Tr. 359-60). Therein he opined that, effective from December 3, 2007, Cook was suffering from moderate pain and could only lift and carry up to ten pounds, sit for a total of three hours in an eight-hour day, and stand/walk for a total of one hour in an eight-hour day. (Id.). He further opined that Cook could not sit upright for extended periods of time and had to lie down periodically during the day to relieve the pain. (Id.).

### D. Administrative hearing testimony

Three people testified at the administrative hearing: Cook; her longtime friend and co-worker, Gary Picket; and a vocational expert. The ALJ examined Cook first. (Tr. 46-51). Honing in on Cook's employment history, the ALJ initially asked her to describe how her various ailments had impacted her ability to work. (Tr. 46-51). Cook responded that her depression was helped by Paxil, but that Detrol was no longer effective in controlling her urinary incontinence, that she was constantly running to the bathroom, and that she found it difficult to get a decent night's sleep as a result. (Tr. 53-4, 79-80). She further testified that she was "down for the whole day the next day" if she stood or sat too long, generally avoided sewing anything by hand because of the resulting

discomfort, had little stamina, struggled to complete to routine household chores, and could not write a one-page letter without taking breaks. (Tr. 55-57, 63, 73-74, 76-77).

When asked by the ALJ to quantify or otherwise describe how much pain she suffered from on a daily basis, Cook responded that her pain rated a constant six on a scale of one-to-ten. (Id.). She added that the onset of her pain was unpredictable and that her prescription medications often left her feeling dull and lethargic. Consequently, she felt that she was no longer capable of competitively performing her past relevant work. (Tr. 47-48).

The ALJ next asked Cook how she occupied her time, to which Cook responded that she typically spent the bulk of her day either at home in bed or lounging in a recliner at her friend's Bernina store, where she would socialize, watch television, or play computer games. (Tr. 52, 64, 67-69, 75). Upon further inquiry, she acknowledged that she drove daily, grocery shopped weekly, and usually worked a few days per week at the Bernina store. (Tr. 58, 78).

Gary Picket testified next. (Tr. 81). He initially explained that he had befriended Cook years ago while the two were living in Nevada, was instrumental in convincing her to migrate to Minot, and checked in on her at her apartment from time to time. (Tr. 81, 85). He went on to testify that Cook was physically deteriorating, in great pain, unable to see projects through to completion, and had difficulty walking great distances. (Tr. 82).

When asked by the ALJ whether Cook had been working at the Bernina store, Picket responded in the affirmative. (Tr. 83). However, he hastened to add that Cook was not a dependable employee and could not always be counted on to work her scheduled hours. (Id.).

At the conclusion of Picket's testimony, the ALJ posed the following two hypotheticals to the vocational expert ("VE"): (1) whether Cook could perform any of her past relevant work if her

testimony was considered to be credible; and (2) whether an individual with Cook's education, work experience, and impairments, and who has the functional capacity as determined by Dr. Christianson's FCA, indicating a capability of performing light sedentary work, could perform Cook's past relevant work. (Tr. 89-90). The VE responded that, if Cook had the limitations she testified to, she would be precluded her from returning to her past relevant work, but that the individual described in the second hypothetical could perform such work. (Tr. 8).

Upon examination by Cook's attorney, the VE acknowledged that Dr. Fife's Physical Capacities Evaluation of Cook would not allow for any competitive work. (Tr. 92). She further testified that frequent absenteeism, the need to elevate one's feet about chair level, the inability to frequently use one's hands, and need to lie down were all incompatible with employment. (Tr. 92-94).

E.    ALJ's decision

The ALJ stated that he evaluated Cook's claim for disability by following the established five-step sequential analysis for determining whether a person is disabled. (Tr. 12-13). At step one, the ALJ concluded that Cook had not engaged in substantial gainful activity since January 15, 2005. (Tr. 14).

At step two, the ALJ concluded that Cook's degenerative disc disease and chronic pain were severe impairments. However, he was not persuaded that Cook's other diagnosed impairments - urinary urge incontinence, depression, and obesity - could fairly be characterized as severe. In reaching this conclusion, he noted the conspicuous absence of any objective medical evidence linking Cook's weight to her impairments. He further noted that, despite Cook's insistence to the contrary, the record evinced that her incontinence was well controlled with medication. As for

Cook's depression, he noted that its effect on her activities of daily living, social functioning, and ability to sustain focused attention and concentration had been mild. (Tr. 16).

Moving on to step three, the ALJ concluded that the combination of Cook's impairments did not meet or medically equal any of the impairments listed in 20 C.F.R. § 404, Subpart P, Appendix 1. (Tr. 17). Specifically, he opined that "[t]he medical evidence of record [did] not support that [Cook] possesse[d] a musckuloskeletal impairment that [had] rendered her unable to ambulate effectively or perform fine or gross movements effectively on a sustained basis." (Tr. 17).

At the fourth step, the ALJ accepted Dr. Christianson's assessment of Cook's residual functional capacity assessment after discounting Cook's subjective complaints as well as certain other evidence favorable for Cook. In so doing, the ALJ professed to have considered all of the objective medical evidence as well as Cook's subjective pain complaints. (Tr. 17-18).

Notably, the ALJ accepted that Cook's medically determinable impairments could reasonably be expected to cause the alleged symptoms. (Tr. 18). He further acknowledged that the myriad of painkillers taken by Cook over the years lent some credence to her pain complaints. (Tr. 18). However, as the following excerpt from his final decision illustrates, he believed that inconsistencies in the record ultimately undermined Cook's claims of debilitating pain:

> The claimant's daily activities are not supportive of her allegations of disabling pain. For example, the claimant testifies she drives daily to the store and shops, seated, in a motorized scooter. This is inconsistent with her allegation that she is unable to sit very often or for very long. She testifies she can take care of her personal needs, wash the dishes, change her sheets, which presumably involves standing and reaching. Moreover, the claimant testifies that she regularly does her own laundry, which involves rolling it to and from the Laundromat around the corner from her apartment; however, she states that standing is "out of the question for any amount of time." Because one would presume that the claimant must stand and walk as she rolls her laundry cart down the sidewalk, these two reports are inconsistent. Additionally, though the claimant reports she has great difficulty doing most household tasks, she recently attempted to get permission from her apartment

manager to keep a pet, which would obviously require active care, lifting, etc. Finally, though the claimant initially reported at the hearing that she has not sewn for many years due to pain in her hands, she reported to her doctor in may 2009 that she had been sewing and doing other fine work. These inconsistencies do not bolster the claimant's credibility.

(Tr. 18-19).

The ALJ was also of the opinion that Cook's assertion of disabling pain simply was not borne out by the objective medical evidence. (Id.). Specifically, he opined that Cook's treatment history did not reflect a 12-month period of continuing disabling symptoms and otherwise established that she had been able to control her pain effectively with medication. (Id.).

The ALJ discounted Dr. Fife's assessment as well as Picket's testimony on the grounds that their statements regarding Cook's condition were self-contradictory and otherwise inconsistent with the medical evidence. (Tr. 20). He failed, however, to address the affidavit of testimony of Cook's supervisor with respect to her observations regarding Cook's limited ability to work, the fact she needed special accommodations, and that she could not work at a competitive pace. The ALJ made only an oblique reference to the supervisor's statement in addressing why Cook's mental impairments were not severe.

The ALJ instead afforded probative weight to Dr. Christianson's assessment of Cook's RFC, concluding that his assessment was consistent with the record as a whole - even though, as discussed later, Dr. Christianson's assessment did not consider a substantial amount of the record evidence. (Tr. 19-20). The ALJ's ultimate determination of Cook's RFC mirrored what Dr. Christianson stated in his assessment. He concluded that Cook retained the RFC to: (1) lift and/or carry 20 pounds occasionally and 10 pounds frequently; (2) stand/walk/sit for about 6 hours in an 8-hour day;

(3) occasionally balance, stoop, kneel, crawl, and climb; and (4) push/pull without limit. (Tr. 17).

The ALJ next concluded that Cook was capable of returning to her past work as an office manager with the foregoing RFC relying in part on the testimony of the VE. As a consequence, the ALJ ruled that Cook was not disabled within the meaning of the law and was ineligible for either DIB or SSI benefits. (Tr. 21-22).

## II.     GOVERNING LAW

### A.     Standard of review

The scope of this court's review is limited in that it is not permitted to conduct a *de novo* review. Rather, the court looks at the record as a whole to determine whether the Commissioner's decision is supported by substantial evidence. Ellis v. Barnhart, 392 F.3d 988, 993 (8th Cir. 2005).

Substantial evidence is less than a preponderance, but more than a scintilla of evidence. Nelson v. Sullivan, 966 F.2d 363, 366 n.6 (8th Cir. 1992); Robinson v. Sullivan, 956 F.2d 836, 838 (8th Cir. 1992). It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Nelson v. Sullivan, 966 F.2d at 366 n.6 (quoting Richardson v. Perales, 402 U.S. 389, 401(1971)).

Under the substantial evidence standard, it is possible for reasonable persons to reach contrary, inconsistent results. Culbertson v. Shalala, 30 F.3d 934, 939 (8th Cir. 1994). Thus, the standard "embodies a zone of choice within which the [Commissioner] may decide to grant or deny benefits without being subject to reversal on appeal." Id. Consequently, the court is required to affirm a Commissioner's decision that is supported by substantial evidence - even when the court would weigh the evidence differently and reach an opposite conclusion. Id.

In conducting its review, the court is required to afford great deference to the ALJ's credibility assessments when the ALJ has seriously considered, but for good reason has expressly discounted, a claimant's subjective complaints, and those reasons are supported by substantial evidence based on the record as a whole. See Haggard v. Apfel, 175 F.3d 591, 594 (8th Cir. 1999); Brockman v. Sullivan, 987 F.2d 1344, 1346 (8th Cir. 1993). The Eighth Circuit has stated, "Our touchstone is that a claimant's credibility is primarily a matter for the ALJ to decide." Anderson v. Barnhart, 344 F.3d 809, 814 (8th Cir. 2003).

Nonetheless, the court's review is more than a search for evidence that would support the determination of the Commissioner. The court is required to carefully consider the entire record in deciding whether there is substantial evidence to support the Commissioner's decision, including evidence unfavorable to the Commissioner. Ellis v. Barnhart, 392 F.3d at 993.

**B.      Law governing eligibility for adult benefits**

An individual shall be considered to be disabled for purposes of DIB and SSI if the person is unable to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment that can be expected to result in death or that has lasted, or can be expected to last, for a continuous period of not less than twelve months. E.g., Hilkenmeyer v. Barnhart, 380 F.3d 441, 443 (8th Cir. 2004); Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001); see 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).

In deciding whether a claimant is disabled within the meaning of the Act, the ALJ is required to use the five-step sequential evaluation mandated by 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4)[1] and determine:

(1)     whether the claimant is presently engaged in a substantial gainful activity,

(2)     whether the claimant has a severe impairment that significantly limits the claimant's physical or mental ability to perform basic work activities,

(3)     whether the claimant has an impairment that meets or equals a presumptively disabling impairment listed in the regulations,

(4)     whether the claimant has the residual functional capacity to perform his or her past relevant work, and

(5)     if the claimant cannot perform the past work, the burden then shifts to the Commissioner to prove that there are other jobs in the national economy that the claimant can perform.

If the ALJ reaches the fourth or fifth steps, the ALJ must determine a claimant's residual functional capacity ("RFC"), which is what the claimant can do despite his or her limitations. 20 C.F.R. §§ 404.1545, 416.945. The ALJ is required to make the RFC determination based on all relevant evidence, including, particularly, any observations of treating physicians and the claimant's own subjective complaints and descriptions of his or her limitations. Pearsall v. Massanari, 274 F.3d at 1218.

In evaluating a claimant's subjective complaints, the ALJ is required to assess the claimant's credibility in light of the objective medical evidence and "any evidence relating to: a claimant's daily activities; duration, frequency and intensity of pain; dosage and effectiveness of medication; precipitating and aggravating factors, and functional restrictions." Id. In this circuit, these are

---

[1]  The provisions in 20 CFR Part 404 apply to DIB and the provisions in Part 416 apply to SSI benefits.

referred to as the "Polaski factors" after the Eighth Circuit's decision in Polaski v. Heckler, 739 F.2d 1320 (8th Cir. 1984).[2] E.g., Ellis v. Barnhart, 392 F.3d 988, 993-996 (8th Cir. 2005). Claimant's subjective complaints may be discounted only if found to be inconsistent with the record taken as a whole. Pearsall v. Massanari, 274 F.3d at 1218.

Also, the ALJ must give controlling weight to medical opinions of treating physicians that are supported by accepted diagnostic techniques and that are not inconsistent with other substantial evidence. 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2). This rule does not apply, however, to opinions regarding disability or inability to work because these determinations are within the exclusive province of the Commissioner. Id. at §§ 404.1527(e), 416.927 (e). The Eighth Circuit has summarized the relevant rules regarding treating physician opinions as follows:

> Generally, an ALJ is obliged to give controlling weight to a treating physician's medical opinions that are supported by the record. See Randolph v. Barnhart, 386 F.3d 835, 839 (8th Cir. 2004); 20 C.F.R. § 404.1527(d)(2). A medical source opinion that an applicant is "disabled" or "unable to work," however, involves an issue reserved for the Commissioner and therefore is not the type of "medical opinion" to which the Commissioner gives controlling weight. See Stormo [v. Barnhart], 377 F.3d [801, 806 (8th Cir. 2004)] ("[T]reating physicians' opinions are not medical opinions that should be credited when they simply state that a claimant can not be gainfully employed, because they are merely opinions on the application of the statute, a task assigned solely to the discretion of the Commissioner." (internal marks omitted)); 20 C.F.R. § 404.1527(e)(1). Further, although medical source opinions are considered in assessing RFC, the final determination of RFC is left to the Commissioner. See 20 C.F.R. § 404.1527(e)(2).
> . . . .
> The Commissioner defers to a treating physician's medical opinions about the nature and severity of an applicant's impairments, including symptoms, diagnosis and prognosis, what an applicant is capable of doing despite the impairment, and the resulting restrictions. 20 C.F.R. § 404.1527(a)(2). "A treating physician's opinion is due 'controlling weight' if that opinion is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record.'" Hogan v. Apfel, 239 F.3d 958, 961 (8th Cir. 2001) (quoting Prosch v. Apfel, 201 F.3d 1010, 1012-13 ([8th Cir.] 2000)).

---

[2] The Polaski factors are now embodied in 20 C.F.R. §§ 404.1529, 416.929.

Ellis v. Barnhart, 392 F.3d at 994-995.

Disability determinations made by others, while relevant evidence, are not controlling upon the Commissioner. The Commissioner is charged with making her own disability determination based upon the criteria set forth in the Social Security law. E.g., Jenkins v. Chater, 76 F.3d 231, 233 (8th Cir. 1996); 20 C.F.R. §§ 404.1504, 416.904. And, if the ALJ proceeds to the fifth step, the burden shifts to the Commissioner to prove that there are other jobs in the national economy that the claimant can perform. Pearsall v. Massanari, 274 F.3d at 1217.

## III.    THE MOTIONS FOR SUMMARY JUDGMENT

Cook asserts that the ALJ failed to apply the appropriate medical standards and improperly substituted his judgment for that of her treating physician when evaluating the evidence. In so doing, she contends that the ALJ downplayed the severity of her obesity, failed to fully consider her "sleep disturbance," improperly discounted the opinions of her treating physicians, and failed to give due weight to her subjective complaints and the observations of others regarding her condition. Cook further insists that she does not have the residual functional capacity to perform her past relevant work and that her advancing age, education, and work history mandate a favorable finding under the Commissioner's regulations. The Commissioner disagrees with all of these arguments.

### A.    Medical Vocational Guidelines

Cook's attorney argued during the ALJ's hearing, and repeats the same argument here, that Cook was not capable of gainful employment as determined by § 201.14 of the Medical Vocational Guidelines set forth at 20 C.F.R. Pt. 404, Subpt. P, App. 2 (the "Grids"), given that she was closely approaching advanced age at the time of the hearing, her work history, and her education.[3] (Tr. 35-

[3]  Similar provisions applying to SSI can be found at 20 C.F.R. §§ 416.960 et seq.

36).   In response, the Commissioner argues that the Grids apply only at step five of the five-step

sequential analysis and that they were not applicable in this case since the ALJ concluded Cook was

not disabled at step four.

While the ALJ made no ruling on this point, the Commissioner's interpretation of the

governing regulations is a correct one.  Haynes v. Shala, 26 F.3d 812, 815 (8th Cir. 1994) ("The

Medical–Vocational Guidelines are inapplicable because they apply only at step five of the

evaluation."); see also Hoy v. Astrue, 390 Fed.Appx. 587, 593 (7th Cir. 2010) (unpublished order);

Kyle v. Commissioner Of Social Security, 609 F.3d 847, 855 (6th Cir. 2010); 20 CFR §§

404.1520(a)(4)(iv), 4.041560(b)(3), 404.1562(b), 416.960 (b)(3), 416.962(b).   In other words, the

ALJ was not obligated to consider the Grids, but only so long as he correctly decided Cook's

ineligibility for benefits at step four.

**B.      ALJ's treatment of Cook's obesity**

The ALJ made the following findings with respect to Cook's obesity and its impact on her

ability to work.

> The claimant is obese.  At the hearing, she testified that she is 5'4" and weighs
> approximately 275 pounds.  Although she reported that a "normal" weight for her is
> approximately 160 pounds, the medical evidence of record reflects that for the last
> four years, her weight has consistently remained above 210 pounds.  As a result, the
> claimant's BMI has ranged from about 36.0 to 47.0.  An individual with a BMI over
> 30.0 is described as "obese" (SSR 02-1p).  Obesity indicated by a BMI exceeding
> 40.0 is considered "extreme" or Level II obesity, by the National Institute of Health
> (SSR 02-1p).  Despite this, the medical evidence of record does not reflect that the
> claimant's physicians considered the claimant's obesity to cause limitations alone or
> in combination with other impairments. Similarly, the claimant did not allege any
> limitations at the hearing due to her obesity.  The undersigned therefore concludes
> that her obesity is nonsevere.

(Tr. 15).

Cook contends that the ALJ failed to: (1) "appropriately apply SSR-00-3p in evaluating the severity of the claimant's extreme obesity, as indicated by her height of 5'4 and weight of 275 pounds;" and (2) "comply with SSR 02-01p in not fully considering the impact of [her] obesity on her ability to work."    In response, the Commissioner stresses that Cook has not cited any medical evidence to support her assertions.  He further asserts that the ALJ did address Cook's obesity and reasonably found that it was not a "severe" impairment within the meaning of the agency's regulations.

A review of the medical records indicates that, while Cook's obesity was not a source of preoccupation for her or her doctors, it may have been unfair to conclude, as the ALJ did, that none of "claimant's physicians considered the claimant's obesity to cause limitations alone or in combination with other impairments."  (Tr. 15).  The reason why requires some explanation.

In early 2007, there are records indicating that Cook's weight was in the range of approximately 215 pounds.  (Tr. 275).  Later, there is a reference in Dr. Mehta's October 2007 examination that  Cook reported that her weight had increased by about 30 pounds since the prior year, which, if true, would have put her weight at something less than 250 pounds at the time of his examination, as well as Dr. Christianson's "paper" RFC determination later that same month.

In April 2008, there is a discussion in Dr. Fife's records about weight issues with no specific weights being mentioned.  (Tr. 354).  Then, by the time of the hearing, Cook reports her weight as being 275 pounds, which the ALJ did not dispute.  (Tr. 9-10, 15).

Dr. Fife eventually completed his form Physical Capacities Evaluation in which he placed significant limitations upon Cook's functional capacity.  Since the ALJ did not follow up with Dr. Fife regarding why he imposed the limitations he did and since the form he used was not designed

to elicit underlying causes for the limitations, except for mentioning pain, it would be speculation to conclude that Dr. Fife did not consider Cook's obesity to be a factor in the limitations he concluded existed. Given Cook's extreme obesity, it seems much more probable that he did consider it as a factor.

If the only claim here was that the ALJ failed to label Cook's obesity as a severe impairment, it likely would not be grounds for reversal. See, e.g., McNamara v. Astrue, 590 F.3d 607, 611-612 (8th Cir. 2010); Partee v. Astrue, 638 F.3d 860, 863 (8th Cir. 2011); Heino v. Astrue, 578 F.3d 873, 881 (8th Cir. 2009) ("We have held that when an ALJ references the claimant's obesity during the claim evaluation process, such review may be sufficient to avoid reversal."). However, there is a question whether Cook's weight was properly considered in determining her physical RFC, particularly during the later time period under consideration.

**C.    Cook's "sleep disturbance"**

Cook next contends that the ALJ "failed to fully consider [her] sleep disturbance, resulting from her obesity and its affect on her ability to work." Docket No. 13. In so doing, she notes that effects of obesity are not always obvious and some obese people experience sleep apnea, which can lead to drowsiness and lack of mental clarity.

The Commissioner counters that Cook's generic references to her disturbed sleep are not sufficient to establish fatigue as a severe impairment in and of itself. He further asserts that Cook has failed to establish that her ability to work is significantly limited because of her disturbed sleep.

Cook has never been diagnosed with sleep apnea and her attribution of her sleep disturbances to obesity runs counter to the statements she made to physicians, *i.e.*, that she had trouble sleeping because her pain and that she sometimes felt a little sleepy after taking her medication. (Tr. 310

313). Moreover, it does not appear that Cook ever asserted that her sleep disturbance constituted a severe impairment prior to filing the instant appeal. Consequently, the ALJ'S failure to recognize Cook's sleep disturbance as a severe impairment was not error.

### D. The ALJ's credibility assessments

The ALJ acknowledged that Cook's pain complaints were bolstered by the fact that she had received multiple spinal injections and was continually prescribed pain medications by her doctors. Nevertheless, he concluded that the severity of her subjective complaints were overstated.

One of the primary reasons that the ALJ gave for discounting Cook's descriptions of her limitations and her pain complaints was that he perceived they were inconsistent with her daily living activities. Arguably, however, the following daily activities that the ALJ relied upon were minimal:

- The ALJ pointed to the fact that she continued to drive almost every day, but the record reveals that her driving was all in town and short distances, given the size of the community. (Tr. 58, 66). The ALJ observed that she continued to shop for groceries and personal items, but Cook testified she did this only periodically and less so more recently, that she would have someone else carry her groceries into her apartment, and that she frequently utilized a motorized cart while shopping. (Tr. 57-58). She also testified that her parttime work at the Bernina store was close by and that she usually was able to park close because she has handicapped sticker for her vehicle. (Tr. 58).

- The ALJ also pointed to the fact that Cook attended to her personal needs, washed dishes, and changed her sheets, which he viewed as requiring standing and reaching.

24

While Cook acknowledged she performed these tasks, she testified that the activities were minimal (particularly since she lived alone) and still involved pain. She also testified: she would not make complex meals; she did not very often make her bed; she took out the trash, but only to the trash chute next to her door; and, while she would do some vacuuming, she would not do it all at one time and usually in a seated position. (Tr. 63-64).

- The ALJ observed that Cook could take her clothes to the laundromat around the corner, but this involved rolling her laundry around the block using a cart and not carrying her laundry. (Tr. 64).

- The ALJ also pointed to the fact that Cook had recently requested permission to keep a pet in her apartment for companionship to address her depression and stated this would require active care and lifting, etc. However, commonsense would indicate that keeping one small pet, such as a cat, is not the same thing as maintaining the pace and persistence of competitive employment. Further, there was no track history of Cook successfully being able to care for a pet. As of the date of the hearing, she had not gotten one. (Tr. 66).

- The ALJ also pointed to the fact that Cook testified that she had not sewn for many years because of pain in her hands and that this was contradicted by the fact that "she reported to her doctor in May 2009 that she had been sewing and doing other fine work." (Tr. 19). While that might be one way to view the record, another view is that the sewing she mentioned to her doctor was not the professional sewing she did years ago, but rather was sewing for her own clothes, primarily using a machine and

taking frequent breaks. Further, the ALJ left out of his discussion the fact that this subject came up with her doctor because she complained that the sewing she was attempting to do was causing considerable pain in her fingers. (Tr. 72, 73-74, 75-76).

In this case, it is a close question whether the daily activities noted by the ALJ were truly inconsistent with Cook's descriptions of her limitations and pain complaints - particularly as it relates to the time period beginning in late 2007. Compare, e.g., Casey v. Astrue, 503 F.3d 867, 696 (8th Cir. 2004) (ALJ did not err in discounting the claimant's testimony based on the extent of her daily activities) with Reed v. Barnhart, 399 F.3d 917, 922-924 (8th Cir. 2005) (ability to fix meals, do light housework and laundry, and travel short distances provides little or no support for the conclusion that a claimant can perform full-time competitive employment and citing other cases); Tilley v. Astrue, 580 F.3d 675, 681 (8th Cir. 2009) (ability to engage in some life activities, despite the pain it causes, does not mean the claimant has the ability to perform requisite physical activity day in and day out); Tang v. Apfel, 205 F.3d 1084, 1086 (8th Cir. 2000) (same). The court would conclude that Cook's minimal daily living activities were not inconsistent with her alleged limitations and pain complaints.

The ALJ also concluded that the record supported the conclusion that Cook was able to manage her pain with mediation. While that may be one possible view of the record, another view is that, while Cook did obtain some relief from the injections by Dr. Colon for periods of time, that some level of pain was always there and that the pain again worsened a short period of time following the injection treatments. Further, another conclusion that can be drawn from the record is that the pain would increase when Cook attempted more than nominal activity. Finally, the fact

that Cook expressed some satisfaction in obtaining relief from debilitating pain may simply be a matter of degree, *i.e.*, the difference between being bed-ridden and the ability to engage in limited activities.

The court must defer to an ALJ's credibility determinations as long as they are supported by reasons that are plausible and supported by evidence that is substantial. Hamilton v. Astrue, 518 F.3d 607, 613 (8th Cir. 2008); Masterson v. Barnhardt, 363 F.3d 731, 738-39 (8th Cir. 2004). Here, the court concludes it is a close question whether the ALJ properly discounted Cook's subjective complaints to the extent that he did. Since this case must be remanded, a new assessment can be made regarding Cook's credibility.

### E.    The adequacy of the ALJ's hypotheticals and RFC Assessment

Cook argues that the ALJ's RFC determination was flawed. Specifically, Cook asserts that the ALJ engaged in circular reasoning in determining Cook's RFC; that his hypothetical questions to the VE did not capture all of the relevant evidence; that the ALJ improperly rejected the Physical Capacities Evaluation prepared by Cook's treating physician; and that the ALJ, at the very least, should have sought a new medical determination of Cook's RFC. The Commissioner contests each of these points.

### 1.    The ALJ's reasoning was not circular

The court disagrees with the contention that the ALJ's reasoning was circular. The ALJ asked the VE to assume that Cook had the functional capacity to perform in accordance with the assessment made by State agency consultant Dr. Christianson, and the VE opined she could perform her past relevant work with the assumed RFC. Separate from this inquiry, the ALJ concluded that

Cook had the RFC posited in his hypothetical to the VE after discounting evidence favorable to Cook and deciding that Dr. Christianson's assessment should be given the most weight because he perceived it to be consistent with the record as whole. Consequently, putting aside whether the ALJ considered all of the relevant evidence and properly discounted evidence that was considered, there was not a procedural problem with the way in which the ALJ reached his RFC.

### 2. The adequacy of the ALJ's hypothetical questions

Cook also claims that the ALJ failed to include all of Cook's limitations in his questioning of the VE. A "hypothetical question posed to a vocational expert is sufficient if it sets forth impairments supported by substantial evidence in the record and accepted as true by the ALJ." Hunt v. Massanari, 250 F.3d 622, 625 (8th Cir. 2001). In other words, it need not incorporate limitations that the ALJ has properly disregarded. Renstrom v. Astrue, 680 F.3d at 1067; Wildman v. Astrue, 596 F.3d 959, 969 (8th Cir.2010). Essentially, Cook's claim here is that the ALJ failed to take into account all of the relevant evidence in his RFC determination and/or improperly discounted evidence that was favorable to her. These points will be addressed below.

### 3. The ALJ's failure to address the affidavit testimony of Cook's employer in his assessment of Cook's physical RFC

As discussed earlier, Cook went to work parttime for Bernina Plus as a bookkeeper following an assessment by the NDHHS that Cook was only capable of limited parttime work that would allow Cook frequent breaks. The owner of Bernina Plus and Cook's supervisor, Julie Rostad, provided an affidavit dated May 1, 2009, in which she stated: (1) she had employed Cook parttime doing office bookkeeping; (2) Cook had a difficult time performing her tasks at a competitive pace and regular work schedule and worked only when she felt up to it; and (3) Cook

was given special accommodations in terms of allowing her to work at a slower pace and take frequent breaks.

The only reference by the ALJ to Rostad's affidavit testimony was a passing and oblique one. In his discussion of whether Cook's mental impairments were severe, the ALJ stated:

> The claimant and her *former supervisor* report she is slow and requires breaks (testimony and Exhibit 10E). Although this may be attributable to a very small degree to her depression, it is largely due to her pain. Therefore, her depression only mildly limits her in this functional area.

(Tr. 16, emphasis added).

While the ALJ need not discuss every piece of evidence, Rostad's observations go to the heart of the primary issue in this case, *i.e.*, whether Cook had the ability to function in a competitive environment given her impairments, and her affidavit testimony is some of the most probative evidence, since she was able to observe how Cook functioned over an extended period of time in an actual working environment. Also, her testimony corroborated other similar evidence that the ALJ rejected, including the evaluation made by the NDDHS regarding Cook's physical functioning, the hearing testimony of Cook's co-worker, the Physical Capacities Assessment prepared by Cook's treating physician, and Cook's own testimony.

Moreover, it cannot be presumed that the ALJ discounted Rostad's affidavit testimony on credibility grounds. Not only did the ALJ fail to say that, he affirmatively attributed the reported slowness in Cook's performance and her need to take breaks to her problems with pain, which he then just dropped and did not discuss further.

If the failure to address Rostad's affidavit testimony in connection with the determination of Cook's RFC was the only problem with the ALJ's decision, it would be a close question whether remand would be required. But here, it is not the only problem.

29

### 4. The ALJ's reliance upon an RFC assessment that failed to take substantial amounts of the relevant evidence

In making his RFC determination, the ALJ gave substantial, if not controlling, weight to the "paper" assessment of Cook's RFC that was made by Dr. Christianson, a nontreating, nonexamining State agency consultant.[4] (Tr. 291-293). Purportedly, this assessment included a review of the medical evidence (*e.g.*, clinical and laboratory findings, symptoms, and observations) in the SSA's record as well as lay evidence, reports of daily living activities, and other relevant observations. (Tr. 291).

The problem here, however, is that Dr. Christianson's assessment was made on or before October 23, 2007, which means that he did not consider any of the evidence generated thereafter, including:

- The record of Dr. Colon's physical examination of Cook on October 29, 2007, which included the following observations:

    > The patient appears under a significant amount of distress with any and every maneuver I have done to examine her neck and lower back. The patient has a significant amount of myofascial tenderness on the neck and upper back, as well as the paravertebral musculature throughout her entire low lumbar thoracic spine. * * * *
    > The remainder of the examination was unable to be performed due to the patient's extreme discomfort with even some of the basic physical maneuvers.

    (Tr. 323).[5]

---

[4]  While Dr. Christianson is referred to in his report as "Thomas Christianson," there is other information in the record stating that Christianson is an MD, but nothing regarding his area of practice or qualifications. (Doc. Nos. 17, 97). Consequently, the court can only assume that he has the minimal qualifications for a degree and no specialized training or experience regarding the matters for which he offered an opinion.

[5]  The court is aware that Dr. Johnson reviewed and affirmed Dr. Christianson's assessment of October 23, 2007, on January 25, 2008, apparently because of a request for reconsideration of the initial denial of benefits. (Tr. 112, 99, 332-335). However, it is not clear what Dr. Johnson reviewed since his report does not so indicate, which is a common problem with the State agency consultant reviews based on this court's experience. See also Pletsch v. Astrue,

- The diagnostic imaging ordered by Dr. Colon following his examination that was performed on October 30, 2007. This included an MRI of Cook's cervical and lumbar spine that went beyond the x-ray evidence available earlier, as well as additional x-rays.

- The records of Dr. Colon's injections to address Cook's pain complaints following his October 2007 workup.

- All of Dr. Fife's treatment records, beginning when he first saw Cook on December 3, 2007, through the time of the ALJ's decision in 2009, including his prescriptions of pain medication.

- Dr. Fife's Physical Capacities Evaluation.

- The affidavit testimony of Cook's employer discussed earlier.

- The vocational assessment made by the NDDHS that Cook was severely disabled and capable of only limited, parttime work in a setting in which she would be able to take frequent breaks.

- The record evidence suggesting that plaintiff's obesity may have gotten worse from October 2007 to the time of the ALJ's hearing, as discussed earlier.

Here the evidence that Dr. Christianson did not consider is substantial. Further, in addition to the longitudinal relevance of the evidence to the time period predating Dr. Christianson's assessment, some of the evidence would support a conclusion that Cook's condition was getting

---

No. 1:08–CV–026, 2009 WL 511409, *24, 139 Soc.Sec.Rep.Serv. 626 (D.N.D. 2009). Further, shortly before his review, the SSA sent out a requests for additional records (Tr. 307), and it is not clear from the record when the SSA received the records back from the medical care provider. Consequently, it cannot be determined from the record whether Dr. Johnson reviewed any of the relevant medical records that followed Dr. Christianson's assessment through January 25, 2008, including the records relating to the treatment provided by Dr. Colon and Dr. Fife during that time frame See id.

worse in the latter part of 2007 and that her RFC materially changed from that reflected in the evidence that Dr. Christianson did consider - much of which was from the 2005 and 2006 timeframe.

Under these circumstances, the ALJ should have obtained a new or updated medical assessment of Cook's RFC to support his ultimate determination. Cf. Vossen v. Astrue, 612 F.3d 1011, 1016 (8th Cir. 2011) ("The ALJ bears the primary responsibility for determining a claimant's RFC and because RFC is a medical question, some medical evidence must support the determination of the claimant's RFC."); Wildman v. Astrue, 596 F.3d 959, 9670-968 (8th Cir. 2010) (opinions of nonexamining State agency consultants not entitled to significant weight, in part, because they did not have access to a number of relevant medical records); Wilcockson v. Astrue, 540 F.3d 878, 880 (8th Cir. 2008) (noting the problems with an RFC assessment that failed to take into account record evidence); Maxwell v. Astrue, No. 4:11CV 1596, 2012 WL 2885433, *16 (E.D. Mo. 2012) (concluding that an RFC assessment by a nonexamining state agency consultant was not substantial evidence in part because it did not take into account critical evidence after the date of the assessment). And because the ALJ failed to do so, remand is required.

Separately, the court also concludes that substantial evidence is lacking for the ALJ's RFC assessment, particularly as it relates to the time period beginning in the second half of 2007, given the lack of reliance that could be placed on Dr. Christianson's assessment because of the record evidence he did not consider and the substantial evidence to the contrary.[6]

_____

[6] While the court reaches this conclusion for the reasons stated, the court is also of the view that Dr. Christianson's assessment was no more persuasive than Dr. Fife's Physical Capacities Evaluation - particularly as it relates to the time period beginning in the later part of 2007. Dr. Christianson's assessment was little more than a "check-a-box" evaluation by a nontreating, nonexamining source, even though it purported to rely upon the physical examination conducted by Dr. Mehta a few days prior at the behest of the SSA. This is because Dr. Mehta made no findings or conclusions that directly addressed the critical points in question with respect to Cook's RFC, *i.e.*, her ability to sit for extended periods of time with only normal breaks, her ability to work with an acceptable number of absences, and her ability to perform at a pace and persistence consistent with competitive employment. Consequently, Dr. Christianson's conclusions relevant to these points (expressed by checking boxes in his form assessment) were nothing

### 5. Evidence that the ALJ may have improperly discounted in making the determination of Cook's RFC

While the court concludes that the foregoing requires that this case be remanded, there are several other points where the court has doubts about the reasons expressed by the ALJ for discounting certain evidence favorable for Cook in making his RFC determination, keeping in mind that the weighing of evidence and making credibility determinations is the function of the ALJ. Already discussed was the ALJ's reliance upon Cook's arguably minimal daily living activities to discount her accounts of her limitations and pain complaints. Another is the NDDHS evidence.

As noted earlier, the NDDHS made an assessment of Cook's disabilities in connection with an application for vocational rehabilitation services in February 2008. The assessment was that Cook was severely disabled under NDDHS criteria, that she was capable of working only limited hours, and that she required a position where she could take frequent breaks. (Tr. 234-235).

The ALJ summarily dismissed the documentary evidence from the NDDHS, focusing upon a "Narrative Justification" that he characterized as "not an opinion at all but a mere recitation of the claimant's self-reported limitations." (Tr. 20). Implicit in that conclusion, however, is that NDDHS

---

more than gross judgments based on Dr. Mehta's more general findings together with other record evidence, which at the time of his assessment was similarly not specific. In addition, while Dr. Christianson's report recited some of Dr. Mehta's general findings, he provided no explanation for how he came to the conclusions expressed in the boxes that he checked in his form evaluation. See McCoy v. Astrue, 648 F.3d 605, 615-616 (8th Cir. 2011) (opinions of nonexamining sources generally given less weight than opinions of treating sources, particularly when the "nonexamining expert's opinion is given in checklist format" without an explanation that goes beyond merely reciting the records considered); Schmidt v. Astrue, No. 10–CV–3063, 2012 WL 40466, *11 (N.D. Iowa 2012) (concluding that similar evaluations, even after applying the regulatory guidelines for their consideration, had "very little indica of reliability," given that the relevant conclusions were expressed by checking boxes with no accompanying explanation other than a laundry list of prior medical history).

Why the SSA did not request Dr. Mehta to make specific findings regarding Cook's ability to stand and walk, sit with normal breaks, etc., since he had the benefit of actually meeting and observing Cook, even if his findings were limited to only what he determined from his examination with the final assessment to be made by Dr. Christianson based on all of the records, is not entirely clear.

personnel accepted whatever Cook stated and did not assess for themselves whether she was credible and in need of services. The court is not so sure.

Further, the "Narrative Justification" was only a portion of the documentary evidence from the NDDHS, and there is some question whether the ALJ considered all of the NDDHS evidence in its full context. Notably, there was also a form assessment completed by NDDHS personnel that included specific findings and conclusions. (Tr. 232-235). And while NDDHS personnel may have substantially relied upon what Cook told them in making their assessment, they did have the opportunity to meet and interact with Cook and make some determination regarding her credibility.

In addition, the NDDHS's involvement with Cook was not a one-time event. Following the NDDHS's initial assessment in February 2008, Cook was assigned a vocational counselor. And it was only after Cook obtained her parttime employment with the Bernina store, which offered the limited hours and flexible working conditions that met Cook's capabilities as assessed by the NDDHS, that the NDDHS purchased a chair for her that had arm rests and adjustable lumbar support to help with her limited employment. Also, the records suggest that the NDDHS followed Cook thereafter and did not close its "case" for rehabilitation service until November 2008, when both Cook and her counselor were satisfied she was in an appropriate vocational setting, and that its evaluation of Cook's limited ability to function did not change during this time frame. (Tr. 231, 236).

Undoubtedly, the NDDHS's criteria for services are different from the SSA's criteria for disability. That being said, the NDDHS is not a partisan; it expended State resources on Cook's behalf after interaction with her that apparently involved more than one meeting; and a number of

its observations and conclusions regarding Cook's ability to function are obviously relevant with respect to Cook's RFC as well as to the credibility of her subjective complaints.

### F.    Weight afforded to the opinions of treating physicians

Cook argues that controlling weight should have been given to Physical Capacities Evaluation prepared by Dr. Fife, which the ALJ noted in his decision would require a finding of disability - at least as of some date.  Here the ALJ did give reasons for discounting Dr. Fife's evaluation, and the court is not prepared to conclude that his reasons were all necessarily erroneous.[7] Moreover, it may be that a medical expert reviewing the record evidence anew, including the evidence that Dr. Christianson did not consider, would reach the same conclusion as Dr. Christianson regarding Cook's RFC and be able to give good reasons for his or her assessment.

Cook contends that the ALJ failed to develop the facts fully and fairly to the extent that he "improperly rejected the opinions of the treating physicians without requesting additional information from the physicians seeking clarification." (Doc. No. 13).

The ALJ has a duty to develop the record fairly and fully, independent of the claimant's burden to press his case. Ellis v. Barnhart, 392 F.3d 988, 994 (8th Cir. 2005). "Although that duty may include recontacting a treating physician for clarification of an opinion, that duty arises only if a crucial issue is undeveloped." Id.; see also Sultan v. Barnhart, 363 F.3d 857, 863 (8th Cir. 2004) ("The ALJ is required to recontact medical sources and may order consultative evaluations only if

_____

[7]    That being said, the court is particularly dubious about the ALJ's statement that:  "given the claimant's allegations and Dr. Fife's opinion of totally disabling symptoms, one might expect to see some indication in Dr. Fife's treatment records that he placed restrictions on the claimant, suggested surgery, or referred the claimant for physical therapy."  (Tr. 20). The latter two points border on being beyond the ALJ's expertise.  Also, they ignored the record.  As noted earlier, when Cook first saw Dr. Fife, she was already being seen by Dr. Colon, a pain specialist, and, after the short-term relief that Cook obtained from injections administered by  Dr. Colon passed, Dr. Fife referred her back to Dr. Colon.  Further, it is not apparent why Dr. Fife would in this particular case have explicitly placed limitations on Cook's activity, since it appears her activity was already limited and no request was made that he do so until he was asked to prepare his Physical Capacities Evaluation.

the available evidence does not provide an adequate basis for determining the merits of the disability claim."); Social Security Ruling 96-5p (1996), 1996 WL 374183, at *2, *5 (requiring an ALJ to make a reasonable effort to recontact a treating source who offers an ultimate-issue opinion for clarification of reasons if he cannot ascertain the basis of the opinion from the case record); 20 C.F.R. §§ 404.1512(e), 404.912(e) (discussing when the SSA will recontact medical sources).

In this case, the court is convinced that the ALJ erred by at least not obtaining an updated medical assessment of Cook's RFC. The court is not convinced, however, that the ALJ was required to contact either Dr. Fife or Dr. Colon.

## IV.    CONCLUSION AND ORDER

In summary, the ALJ committed several errors that, if not individually, at least together, create sufficient doubt about whether Cook was properly denied benefits - particularly for the period beginning in the latter part of 2007 to the time of the ALJ's decision on September 30, 2009. Cf. Wilcockson v. Astrue, 540 F.3d at 879-110.   Normally, remand for further determination by the agency is the remedy when there are deficiencies in the Commissioner's determination. It is only when the total record convincingly establishes disability and is transparently one-sided against the Commissioner's decision that a remand for an award and computation of benefits is warranted. See, e.g., Pate-Fires v. Astrue, 564 F.3d 935, 947 (8th Cir. 2009); Hutsell v. Massanari, 259 F.3d 707, 714 (8th Cir. 2001).  Such is not the case here.

Based on the foregoing, the Commissioner's Motion for Summary Judgment (Docket No. 14) is **DENIED**; Cook's Motion for Summary Judgment (Docket No. 10) is **GRANTED IN PART**; the decision of the Commissioner is **REVERSED** and this matter is **REMANDED** to the Commissioner under sentence four of 42 U.S.C. § 405(g) for further proceedings.

Judgment shall be entered accordingly.

**IT IS SO ORDERED.**

Dated this 26th day of July, 2012.

*/s/ Charles S. Miller, Jr.*
Charles S. Miller, Jr.
United States Magistrate Judge
